No. 25-1066

# IN THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

International Brotherhood of Electrical Workers,
Local Union 29, AFL-CIO,

Plaintiff-Appellee,

v.

Energy Harbor Nuclear Corp.,

Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Pennsylvania
Case No. 2:23-cv-761

# BRIEF OF AMICUS CURIAE INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS IN SUPPORT OF PLAINTIFF-APPELLEE'S PETITION FOR REHEARING

Jonathan D. Newman
Jacob J. Demree
Courtney A. Kirbis*
SHERMAN DUNN, P.C.
900 Seventh Street, N.W.
Suite 1000
Washington, D.C. 20001
(202) 785-9300

*Application for admission
pending

*Counsel for International
Brotherhood of Electrical Workers*

April 9, 2026

# DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, Amicus International Brotherhood of Electrical Workers provides the following disclosure statement:

The International Brotherhood of Electrical Workers is an unincorporated labor association. It has no parent companies, and no publicly held company holds ten percent or more of its stock. The International Brotherhood of Electrical Workers is not aware of any nonparty, publicly held corporations with financial interests in the outcome of this proceeding.

# TABLE OF CONTENTS

Disclosure Statement ............................................................................i

Table of Authorities................................................................... iii

Statement of Interest ........................................................................1

Argument................................................................................................3

    I.    Unions Have Negotiated Arbitration Agreements for Decades...........................................................................3

    II.    The Panel Ignored the *Steelworkers* Trilogy. .........................5

    III.    The Panel Missed a Key Fact. ............................................12

Conclusion ...................................................................................14

Certificate of Compliance........................................................

Certificate of Service ..............................................................

# TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*AT&T Techs., Inc. v. CWA,*
  475 U.S. 643 (1986) ....................................................................9-10

*ATU Loc. 880 v. N.J. Transit Bus Operations, Inc.,*
  975 A.2d 403 (N.J. 2009) ................................................................11

*Cup v. Ampco Pittsburgh Corp.,*
  903 F.3d 58 (3d Cir. 2018)...............................................................10

*E.M. Diagnostic Sys., Inc. v. Loc. 169, Int'l Brotherhood of*
  *Teamsters*, 812 F.2d 91 (3d Cir. 1987) ..........................................12

*Int'l Ass'n of Machinists, Dist. No. 15 v. Cutler-Hammer, Inc.,*
  67 N.Y.S.2d 317 (App. Div. 1947) (per curiam), *aff'd*, 74
  N.E.2d 464 (N.Y. 1947) .................................................................8-9

*Rite Aid of Pa., Inc. v. UFCW Loc. 1776,*
  595 F.3d 128 (3d Cir. 2010)........................................................10-12

*Textile Workers Union v. Lincoln Mills,*
  353 U.S. 448 (1957) ...........................................................................5

*United Steelworkers v. Am. Mfg. Co.,*
  264 F.2d 624 (6th Cir. 1959), *rev'd*, 363 U.S. 564 (1960) .............7-9

*United Steelworkers v. Am. Mfg. Co.,*
  363 U.S. 564 (1960) ...........................................................1-2, 6-10

*United Steelworkers v. Enter. Wheel & Car Corp.,*
  363 U.S. 593 (1960) ...........................................................................6

*United Steelworkers v. Warrior & Gulf Navigation Co.,*
  363 U.S. 574 (1960) .......................................................................6-7

**Statutes**

29 U.S.C. § 173(d)............................................................................ 1, 4

29 U.S.C. § 185 ..................................................................................4-5

**Other Authorities**

Fed. R. App. P. 29(a)(4)(E) ....................................................................2

Fed. R. App. P. 29(b)(2) ..........................................................................2

R.W. Fleming, *The Labor Arbitration Process* (1965) ..........................3-4

# STATEMENT OF INTEREST

The International Brotherhood of Electrical Workers ("IBEW") is a labor organization that represents approximately 887,000 active and retired members in the broadcasting, telecommunications, construction, manufacturing, railroad, and public utility industries, as well as public sector workers who work for government agencies. The IBEW has 762 local unions across the United States and Canada, which are party to approximately 3,600 collective bargaining agreements. Virtually every one of those agreements has some form of arbitration or similar alternative dispute resolution procedure for the resolution of grievances in which one of the parties claims that the collective bargaining agreement was breached.

The panel in this case found that a grievance filed by IBEW Local 29 was not within the scope of the local's collective bargaining agreement *after evaluating the merits of that grievance*. That is contrary to the critical labor policy set out in the Taft-Hartley Act of advancing agreed-upon alternative dispute resolution procedures in collective bargaining agreements, *see* 29 U.S.C. § 173(d), which "can be effectuated only if the means chosen by the parties for settlement of their differences

under a collective bargaining agreement is given full play," *United Steelworkers v. Am. Mfg. Co.*, 363 U.S. 564, 566 (1960). The outcome of this case is important to the IBEW because it impacts the rights of members of one of its locals and threatens decades of precedent protecting the labor arbitration process.

The IBEW files this brief with leave of the Court under Federal Rule of Appellate Procedure 29(b)(2). Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), the IBEW and its counsel declare that: (1) no party's counsel authored this brief in whole or in part; (2) no party or party's counsel contributed money to fund the preparation or submission of the brief; and (3) no person other than the IBEW, its members, and its counsel has contributed money to fund the preparation or submission of the brief.

# ARGUMENT

## I.  Unions Have Negotiated Arbitration Agreements for Decades.

The panel majority's decision to "peek at the merits" of Local 29's grievance is contrary to over sixty years of settled Supreme Court precedent.  Panel Op. 7.  The majority's "closer look under the hood" also misinterpreted the facts.  *Id.*  But most concerningly for the IBEW, the majority's decision threatens to upend over 150 years of peaceful resolution of labor disputes through the grievance and arbitration process.

Unions have included arbitration clauses in their collective bargaining agreements since as far back as 1829.  *See* R.W. Fleming, *The Labor Arbitration Process* 1 (1965) (describing arbitration clause in the 1829 constitution of the Journeymen Cabinet-Makers of Philadelphia).  Pittsburgh ironworkers arbitrated a dispute in 1865, and unions in the coal and footwear manufacturing industries used arbitration in the early 1870s.  *Id.* at 1-2.  In 1871, the Committee of the Anthracite Board of Trade and the Committee of the Workingmen's Benevolent Association agreed to settle disputes using an outside umpire.  *Id.* at 2.  And after a garment workers strike in 1910, future Supreme Court Justice Brandeis

helped create a "protocol of peace" that included binding arbitration by a board consisting of representatives of labor and management and a third-party neutral. *Id.* at 7.

The first half of the twentieth century saw an explosion in the number of arbitration agreements in collective bargaining agreements, driven by rising unionization and government intervention. *See* Fleming, *supra*, at 11-18. In the 1930s, less than 10% of collective bargaining agreements provided for arbitration. *Id.* at 13. But by 1941, that number rose to 62%. *Id.* By 1944, unions and employers included arbitration as a means to resolve disputes in 73% of their collective bargaining agreements. *Id.* at 18. And by 1952, 89% of collective bargaining agreements included arbitration provisions. *Id.*

The Taft-Hartley Act, passed in 1947, expressed a clear federal preference for arbitration of labor disputes. Section 203(d) provides that "[f]inal adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement." 29 U.S.C. § 173(d). Section 301 gives federal courts jurisdiction to enforce agreements to arbitrate in collective bargaining

agreements. *Id.* § 185. As the Supreme Court explained in *Textile Workers Union v. Lincoln Mills*, Taft-Hartley "expresses a federal policy that federal courts should enforce [labor arbitration] agreements on behalf of or against labor organizations and that industrial peace can be best obtained only in that way." 353 U.S. 448, 455 (1957).

IBEW locals consistently rely on arbitration to resolve their disputes. As stated, IBEW local unions are party to approximately 3,600 collective bargaining agreements, and virtually every one of them includes some form of arbitration or similar alternative dispute resolution procedure for the resolution of grievances. In line with decades of collective bargaining agreements and the federal policy in favor of labor arbitration, the IBEW's locals depend on their arbitration agreements to promptly and effectively resolve disputes. When IBEW locals "invoke[] a right squarely contained in a CBA with a broad arbitration clause," like Local 29 did here, they expect that a court will compel the parties to comply with the agreement to arbitrate. Dissent 10.

## II.  The Panel Ignored the *Steelworkers* Trilogy.

The panel's opinion ignored the *Steelworkers* Trilogy, which defines

courts' and arbitrators' roles in the labor arbitration process.[1] In the

*Steelworkers* cases, the Supreme Court explained that labor "arbitration

is the substitute for industrial strife." *Warrior & Gulf*, 363 U.S. at 578.

Grievances and arbitration are the "vehicle by which meaning and

content are given to the collective bargaining agreement." *Id.* at 581.

The grievance process, "rather than a strike, is the terminal point of a

disagreement." *Id.*

Arbitrators' decisions are valid only to the extent they interpret and

apply the collective bargaining agreement. *Enter. Wheel*, 363 U.S. at 597.

But arbitrators are expected to apply "the industrial common law — the

practices of the industry and the shop — [which] is equally a part of the

collective bargaining agreement." *Warrior & Gulf*, 363 U.S. at 581-82.

Parties choose arbitrators for their expertise in the common law of the

shop, expecting that they will evaluate how a grievance would affect

factors like productivity, morale, and tensions in the workplace. *Id.* at

---

[1]    The *Steelworkers* Trilogy consists of three Supreme Court decisions issued in 1960: *United Steelworkers v. American Manufacturing Co.*, 363 U.S. 564 (1960), *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574 (1960), and *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593 (1960).

582. "The ablest judge cannot be expected to bring the same experience and competence to bear upon the determination of a grievance, because he cannot be similarly informed." *Id.*

Courts in turn have a "very limited" function in deciding whether to order the parties to a collective bargaining agreement to arbitrate a dispute. *Am. Mfg.*, 363 U.S. at 567. That function "is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract." *Id.* at 568. Courts should order arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Warrior & Gulf*, 363 U.S. at 582-83.

In *American Manufacturing*, the union filed a grievance over whether an injured employee was fit to return to work. After considering the language of the collective bargaining agreement, the kind of work the employee would be required to do, and findings from physical examinations, the court below had determined that the grievance was "so lacking in probative value . . . as to compel the conclusion that the so-called claim or grievance [was] a frivolous, patently baseless one, not subject to arbitration under the collective bargaining agreement." *United*

*Steelworkers v. Am. Mfg. Co.*, 264 F.2d 624, 628 (6th Cir. 1959). Similarly, in a New York case cited by the *American Manufacturing* Court, a court held that its own interpretation of a collective bargaining agreement was "[s]o clear," and that "any other interpretation" was "so untenable," that it was "obliged to hold that there [was] no dispute as to the meaning of the [agreement] and no contract to arbitrate the issue tendered." *Int'l Ass'n of Machinists, Dist. No. 15 v. Cutler-Hammer, Inc.*, 67 N.Y.S.2d 317, 318 (App. Div. 1947) (per curiam), *aff'd*, 74 N.E.2d 464 (N.Y. 1947).

But the Supreme Court rejected these decisions, explaining that judges "have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim." *Am. Mfg.*, 363 U.S. at 568 (footnote omitted). The agreement to arbitrate "is to submit all grievances to arbitration, not merely those which the court will deem meritorious." *Id.* Even "frivolous claims" may be arbitrable, since the parties may have reasons for processing those claims that "those who are not a part of the plant environment," like judges, may not know or understand. *Id.*

To the *American Manufacturing* Court, the case was simple. The union claimed that the employer had violated the collective bargaining agreement. The employer disagreed. "There was, therefore, a dispute between the parties as to 'the meaning, interpretation and application' of the collective bargaining agreement. Arbitration should have been ordered." 363 U.S. at 569.

Here, the first citation to the *Steelworkers* cases comes in the dissent. The panel does not once cite the *Steelworkers* cases, and it in fact ignores the Supreme Court's directive, holding that the grievance here "'has nothing to do with' the Union's rights under the collective-bargaining agreement because . . . there is no evidence that Energy Harbor incurred an increase in its health care plan costs from 2021 to 2022." Panel Op. 8. In other words, like the lower courts whose decisions the *American Manufacturing* Court rejected, the panel interpreted the collective bargaining agreement and refused to order arbitration because *it* decided that the grievance was "so lacking in probative value," *Am. Mfg.*, 264 F.2d at 628, and "so untenable," *Cutler-Hammer*, 67 N.Y.S.2d at 318.

The Court's role, however, is *not* "to determine the relative merits

of the parties' substantive interpretations of the agreement." *AT&T Techs., Inc. v. CWA*, 475 U.S. 643, 651 (1986). It is only "to determine whether the parties intended to arbitrate grievances" concerning contributions to the union's health care plan. *Id.* Here, where Local 29 claims that Energy Harbor violated Article VIII, ¶ C.2(a) of the collective bargaining agreement, and where Energy Harbor claims that it complied with Article VIII, ¶ C.2(a), there is "a dispute between the parties as to 'the meaning, interpretation and application' of the collective bargaining agreement. Arbitration should have been ordered." *Am. Mfg.*, 363 U.S. at 569.

This Court's decisions in *Rite Aid of Pennsylvania, Inc. v. UFCW Local 1776*, 595 F.3d 128 (3d Cir. 2010) and *Cup v. Ampco Pittsburgh Corp.*, 903 F.3d 58 (3d Cir. 2018) are nothing like this case. In both cases, the disputes involved employees who were not subject to the collective bargaining agreements. *Cup*, 903 F.3d at 62-63; *Rite Aid*, 595 F.3d at 134. But in this case, nobody disputes that the grievance concerns the rights of covered employees.

And in *Rite Aid*, the arbitration clause was limited to grievances "involv[ing] the *interpretation* of any provision of th[e] Agreement." 595

F.3d at 132 (emphasis altered). But here, the arbitration clause applies to any dispute over "the interpretation, *application, or operation* of any provision of this Agreement." Appx086 (emphasis added). That language "confer[s] broad interpretive power" on arbitrators. *ATU Loc. 880 v. N.J. Transit Bus Operations, Inc.*, 975 A.2d 403, 412 (N.J. 2009). The arbitration clause is not limited "to those disputes which require interpretation of the agreement." Panel Op. 5 (quoting *Rite Aid*, 595 F.3d at 132).

Here, Local 29 grieved Energy Harbor's "fail[ure] to adjust the 2022 health care contributions by the percentage needed to satisfy the arbitration award FMCS Case No. 21022-04248." Appx137. That allegedly violated Article VIII, ¶ C.2(a) of the collective bargaining agreement, which requires that Energy Harbor increase monthly contributions to the union's health care plan "by the same percentage as any increase incurred by the Company's Health Care Plan from the previous year." Appx083. The grievance concerns the *operation* of Article VIII, ¶ C.2(a) of the collective bargaining agreement in light of the past arbitration decision. Under Local 29's broad arbitration clause, the grievance cannot be "excluded from arbitration." Panel Op. 5 (quoting

11

*Rite Aid*, 595 F.3d at 132).

The panel was "not free" to characterize the grievance as frivolous. *E.M. Diagnostic Sys., Inc. v. Loc. 169, Int'l Brotherhood of Teamsters*, 812 F.2d 91, 97 (3d Cir. 1987). Deciding the merits of Local 29's dispute, "whether easy or difficult," should have been "left to the arbitrator." *Id.*

## III.  The Panel Missed a Key Fact.

Despite looking into the merits, the panel missed the crucial fact that Energy Harbor *decreased* its contribution to Local 29's health care plan. The 2022 arbitration award required Energy Harbor to increase its contributions for 2021 by 6.7%. Appx213. In accordance with the award, Energy Harbor paid the increased contributions to the union's plan through the end of the 2021 plan year (December 31, 2021). But starting on January 1, 2022, Energy Harbor paid *less* to Local 29's health care plan than it paid during 2021. Appx024 ¶ 21. In 2022, Energy Harbor did not incur an increase in cost for its own health plan, but its costs did not decrease.

As the panel acknowledged, Article VIII, ¶ C.2(a) requires that Energy Harbor "match any increases that it makes to its own health care plan each year." Panel Op. 6. If Energy Harbor increased its contribution

to its own plan by $5, contributing less than $5 to the union's plan would unquestionably violate the collective bargaining agreement. In the same way, if Energy Harbor kept its costs for its plan flat, but decreased the contribution for the union's plan, that would violate Article VIII, ¶ C.2(a), or at the very least, a grievance alleging such a violation would present a colorable claim. To the extent Energy Harbor disagrees and contends the 2022 arbitration decision is not factored in under Article VIII, ¶ C.2(a), Energy Harbor challenges the *operation* of Article VIII, ¶ C.2(a), which the collective bargaining agreement expressly makes arbitrable. *See* Appx086.

All Local 29 is seeking to arbitrate is the narrow issue that Energy Harbor violated Article VIII, ¶ C.2(a) by decreasing its 2022 contribution to Local 29's health care plan when Energy Harbor's costs for its own plan did not decrease. That issue is arbitrable, and the panel should have affirmed the court below and allowed an arbitrator to determine the merits of the grievance.

## CONCLUSION

This Court should grant the petition for rehearing or, alternatively, grant rehearing en banc.

Respectfully submitted,

s/ Jonathan D. Newman
Jonathan D. Newman
   D.C. Bar No. 449141
Jacob J. Demree
Courtney A. Kirbis*
SHERMAN DUNN, P.C.
900 Seventh Street, N.W.
Suite 1000
Washington, D.C. 20001
(202) 785-9300
newman@shermandunn.com
demree@shermandunn.com
kirbis@shermandunn.com

*Application for admission pending

*Counsel for International
Brotherhood of Electrical Workers*

April 9, 2026

# CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Rule 29(b)(4) because, excluding the parts of the document exempted by Rule 32(f), it contains 2,465 words.

2. This document compiles with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in Century Schoolbook font and fourteen-point type.

3. In accordance with Local Rule 28.3(d), I certify that I am a member of the bar of the Third Circuit in good standing.

4. In accordance with Local Rule 31.1(c), (i) this brief has been scanned for viruses using VIPRE Endpoint Security and is free of viruses; and (ii) paper copies of this brief will be identical to the electronic version of the brief filed via CM/ECF if paper copies are required by the Court.

s/ Jonathan D. Newman
Jonathan D. Newman
  D.C. Bar No. 449141
SHERMAN DUNN, P.C.
900 Seventh Street, N.W.
Suite 1000
Washington, D.C. 20001
(202) 785-9300
newman@shermandunn.com

# CERTIFICATE OF SERVICE

I certify that on April 9, 2026, this brief was filed using the Court's CM/ECF system. All attorney participants in the case are registered CM/ECF users and will be served electronically via that system.

s/ Jonathan D. Newman
Jonathan D. Newman
  D.C. Bar No. 449141
SHERMAN DUNN, P.C.
900 Seventh Street, N.W.
Suite 1000
Washington, D.C. 20001
(202) 785-9300
newman@shermandunn.com
